# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF INDIANA
# HAMMOND DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| v. ) | CAUSE NO.: 2:11-CR-133-JTM-PRC |
| ) | |
| THOMAS PHILPOT, ) | |
|     Defendant. ) | |

## OPINION AND ORDER

This matter is before the Court on Defendant's Motion for Change of Venue [DE 45], filed by Defendant Thomas Philpot on April 23, 2012. The Government filed a response in opposition on May 14, 2012, and Philpot filed a reply on May 21, 2012.

## BACKGROUND

In this case, Philpot has been charged with three counts of mail fraud and two counts of theft from a federally funded program in connection with his receipt of "Title IV-D" incentive payments during his tenure as the Clerk of Lake County, Indiana. The indictment charges that Philpot's receipt of the incentive money violated Indiana Code § 31-25-4-23(c), which prohibits elected officials from receiving incentive payments as a supplement to their salary without the "approval of the county fiscal body." Philpot's receipt of the incentive money was reported in the news media as early as 2009, over 18 months prior to the indictment, and has been covered in the news media since that time.

## ANALYSIS

Seeking transfer of venue to the United States District Court for the Northern District of Illinois, Philpot argues that pretrial publicity has tainted the jury pool in Indiana such that a change of venue is the only way to preserve Philpot's right to a fair trial under the Fifth and Sixth Amendments to the United States Constitution.

Although the Constitution provides that trials should occur in the "district wherein the crime shall have been committed," U.S. Const. amend. VI, the Federal Rules of Criminal Procedure create an exception when pretrial prejudice warrants a change of venue: "Upon the defendant's motion, the court must transfer the proceeding against the defendant to another district if the court is satisfied that so great a prejudice against the defendant exists in the transferring district that the defendant cannot obtain a fair and impartial trial there." Fed. R. Crim. P. 21(a). Such a transfer is warranted if "extraordinary local prejudice will prevent a fair trial–a 'basic requirement of due process.'" *Skilling v. United States*, 130 S. Ct. 2896, 2912 (2010) (quoting *In re Murchison*, 349 U.S. 133, 136 (1955)). The decision ruling on a request for change of venue under Rule 21(a) is reviewed for abuse of discretion. *United States v. Nettles*, 476 F.3d 508, 513 (7th Cir. 2007).

"Prejudice can be established by either a showing of actual prejudice, for example, when jurors can be shown to have exposure to pretrial publicity that prevents them from judging the case impartially, or by presumed prejudice, which occurs in cases surrounded by a 'carnival atmosphere,' where 'pervasive and inflammatory pretrial publicity' makes juror bias inevitable." *Nettles*, 476 F.3d at 513 (quoting *United States v. Peters*, 791 F.2d 1270, 1296 (7th Cir. 1986), superseded on other grounds, as stated in *United States v. Guerrero*, 894 F.2d 261, 267 (7th Cir. 1990)). The Seventh Circuit Court of Appeals has said that, in reviewing denials of requests to change venue, the "ultimate question is whether it is possible to select a fair and impartial jury, and in most situations, the voir dire examination adequately supplies the facts upon which to base that determination." *Id*. (quoting *Peters*, 791 F.2d at 1296 (quoting *United States v. Daddano*, 432 F.2d 1119, 1126 (7th Cir. 1970))).

The United States Supreme Court recently addressed the presumption of prejudice arising from pretrial publicity in *Skilling v. United States*, 130 S. Ct. 2896 (2010). The Supreme Court

clarified that, although in prior cases it had overturned convictions obtained in a trial atmosphere corrupted by press coverage, those holdings "'cannot be made to stand for the proposition that juror exposure to . . . news accounts of the crime . . . alone presumptively deprives the defendant of due process.'" 130 S. Ct. at 2914 (quoting *Murphy v. Florida*, 421 U.S. 794, 798-99 (1975)). "Prominence does not necessarily produce prejudice, and juror *impartiality*, we have reiterated, does not require *ignorance*." *Id*. (citing *Irvin v. Dowd*, 366 U.S. 717, 722 (1961); *Reynolds v. United States*, 98 U.S. 145, 155-56 (1879)).

In *Skilling*, the Supreme Court considered several factors, most of which are also relevant in this case, in holding that the district court did not exceed constitutional limitations by declining to grant the request to change venue. 130 S. Ct. at 2917. First, the Court considered the size and characteristics of the community in which the crime occurred. *Id*. at 2915. Second, the Court examined the nature of the news stories, noting that "they contained no confession or other blatantly prejudicial information of the type readers or viewers could not reasonably be expected to shut from sight." *Id*. at 2916. Third, the Court addressed the timing of the trial in relation to the alleged crime, recognizing that over four years had elapsed between the fall of Enron and Skilling's trials and that, although news media coverage continued throughout the period, the level of attention "diminished somewhat" in the years following Enron's collapse. *Id*. Finally, and not relevant at this stage of the proceedings in the instant case, the Court considered the jury's acquittal of Skilling on nine insider-trading counts, noting that earlier instituted prosecutions of Enron also had not yielded an overwhelming victory for the Government. *Id*. The Court concluded that the pervasive pretrial publicity in that case did not inevitably lead to a finding of presumed prejudice and affirmed the denial of a change of venue under Rule 21(a). *Id*. at 2917.

In this case, Philpot argues that the "ongoing barrage of disparaging publicity and pervasive community outrage will prevent him from receiving a fair trial in Indiana." Def. Br., p. 4. Philpot contends that the nature of the pre-trial publicity and community response surrounding his case has been largely editorial and inflammatory, describing it as "salacious." *Id*. at p. 5. The Court disagrees; this is not an "extreme case" in which a presumption of prejudice arises. *See Skilling*, 130 S. Ct. at 2915. Nor is this a case in which publicity has caused a "carnival atmosphere" in the community prior to trial. *See Sheppard v. Maxwell*, 384 U.S. 333, 357-58 (1966); *Nettles*, 476 F.3d at 513.

In support of many of his arguments, Philpot cites extensively from the online comments made by readers in response to the online version of newspaper editorials and articles written about this case. Philpot has submitted a spreadsheet of all of the relevant newspaper articles, identifying the number of online comments made to each and providing sample quotations for each article. The number of online reader comments ranged from as few as 4 comments per article to as many as 62 comments. An example of one these online comments, quoted by Philpot in his motion, likened Philpot to fecal matter who "wont[sic] go away when flushed" while another wrote that the situation "[m]akes me want to puke." Def. Br., p. 5 (quoting a comment to the article listed at Exh. B-01, dated January 18, 2010). However, these online comments are the personal opinions of the anonymous commenting readers and not of the newspaper staff or guest writers. The online comments are contained in a separate section of the webpage following the article, such that it is clear the comments are not an extension of the article and are not being made by the author or other newspaper staff. The comments do not purport to be fact-based. These comments are not included in the traditional print version of the newspapers. Philpot offers no data to show what percentage of newspaper readers, or potential jurors, read the print versus the online versions of the articles,

4

what percentage of those who read the online versions also read the comments, or what readers' attitudes are of the online commentary written by other readers.

Notably, at the time of the Court's online research on June 6, 2012, all of the articles from the Northwest Indiana Times newspaper for which Philpot provided a URL in his spreadsheet in support of the quoted comments no longer have any reader comments following the articles, as indicated by the notation: "(0) Comments". In other words, any inflammatory online public commentary to all the articles listed by Philpot in the spreadsheet and quoted in his motion appear to no longer be available for viewing. It is not clear how long these comments have not been available. However, it appears that anyone reading these articles going forward will not have access to the commentary to which Philpot objects.

As for the content of the newspaper articles themselves, much of the actual reporting of the case has been factual in nature. Philpot notes in his brief that the print media "goes on to report Philpot's admission that he made a mistake, the federal investigation into the story, and Philpot's indictment." Def. Br., p. 6. He also notes that the news media closely followed the indictment and the conditions of his bond. *Id*. More recently, the news media has reported on continuances, the instant motion, and that a new attorney has entered an appearance on Philpot's behalf. All of these are factual matters.

In contrast, some of the news media commentary has been editorial in nature and critical of Philpot. For example, the news media called for the return of the funds, and then, when Philpot decided to return the money, commented, "If you are caught shoplifting, even if you give back all the [merchandise] you took, that does not give you a free pass in the eyes of the law. Ignorance of the law, so goes the old saying, is not an excuse." Def. Br., p. 6 (quoting Exh. B-47, Mark Kiesling, *Mr. Philpot, you should have known better*, NWI Times, October 5, 2011). Philpot also contends

that a comment in the same article implying that Philpot must be guilty because "[t]he U.S. attorney's office does not generally waste its time and manpower on frivolous cases," Def. Br., p. 8 (quoting Exh. B-47), improperly connects the prosecution's success rate with the likelihood of guilt. *See Rideau v. Louisiana*, 373 U.S. 723, 730-31 (1963). Both of these comments were made in one editorial article published over nine months prior to trial. In one January 4, 2012 article, the news media also criticized Philpot's request not to go to trial in the summer because of his family obligations and speculated that the delay must have been caused by Philpot deciding to cooperate with the Government. From this single comment within the article, Philpot reasons that newspaper writers and reader commentators have concluded that he is guilty. This relatively small number of critical articles is not sufficiently inflammatory to establish "inherent prejudice" or to corrupt the trial.

The press coverage of this case has not been pervasive, and the timing of most of the "inflammatory" press coverage and commentary runs counter to Philpot's motion. Philpot argues that the "barrage" of inflammatory publicity has prevented any "softening" of public outrage against him. Contrary to Philpot's reasoning, much of the most "negative" coverage cited by Philpot occurred at least two years ago and over a year and a half prior to the indictment, including the following three article titles cited by Philpot in the text of his motion:

- Andy Grimm, *Child support money upped ex-clerk's pay*, Post-Tribune, January 29, 2010.

- Bill Dolan, *Bonus fever grips county - Side pay is stirring controversy among politicians, taxpayers*, NWI Times, February 7, 2010.

- Bill Dolan, *Full salary for half the attendance – Former Clerk Philpot entitled to cash despite missing 59 meetings*, NWI Times, February 19, 2010.

6

Def. Br., p. 10. In his spreadsheet, Philpot identifies twenty-four other articles (including one cartoon) published between January 18, 2010, and March 26, 2010; these articles were a mix of critical commentary and factual reporting. After that, according to Philpot's spreadsheet, there were three articles published in June 2010, one in November 2010, three in February and March 2011, and one in July 2011.

Following July 2011, no articles were written about Philpot until September 2011, when he was indicted. Twelve articles, dated September 23, 2011, through October 5, 2011, were written in the immediate aftermath of the indictment:

- *Former Lake County Clerk Tom Philpot indicted in federal court*, Chesterton Tribune, September 23, 2011.

- Sarah Tompkins, *Feds say ex-county clerk pocketed money from child support programs*, NWI Times, September 23, 2011.

- Mark Kiesling, *Daniels off target on criticism*, NWI Times, September 25, 2011.

- Rich James, *Philpot has overstayed his welcome on the ballot*, Post Tribune, September 25, 2011.

- Mark Kiesling, *Indictments may induce cooperation from inside*, NWI Times, September 26, 2011.

- Sarah Tompkins, *Philpot to fight public corruption charges,* NWI Times, September 27, 2011.

- Teresa Auch Schultz, *Philpot attorney: Federal charges 'absurd'*, NWI Times, September 27, 2011.

- Kim Krull, *Dems continue to fuel culture of corruption*, NWI Times, September 28, 2011.

- Sarah Tompkins, *Philpot enters not guilty plea, placed on supervised release*, NWI Times.com, September 28, 2011.

- Sarah Tompkins, *Philpot pleads not guilty*, NWI Times, September 29, 2011.

7

- Bill Dolan, *Charges threaten Philpot's livelihood*, NWI Times, October 3, 2011.

- Mark Kiesling, *Mr. Philpot, you should have known better*, NWI Times, October 5, 2011.

Def. Br., Exh. A, pp. 34-40.

Since then, the news media coverage of this case in the last six to seven months has been little more than sporadic and mostly factually informative in nature:

- NWI Times Staff, *Federal judge grants Philpot more time to prepare for trial*, NWI Times, November 11, 2011.

- Bob Kasarda, *Philpot seeking more time to file pre-trial motions*, NWI Times, December 2, 2011.

- Mark Kiesling, *Philpot trial delays raise cooperation questions*, NWI Times.com, January 4, 2012.

- Phil Weiland, *Get ready for some more Amazing predictions*, NWI Times.com, January 6, 2012.

- Bill Dolan, *Decisions, decisions, decisions for 2012 Lake Dems*, NWI Times, January 8, 2012.

- Staff report, *FBI agents pay visit to clerk's office*, Post-Tribune, January 11, 2012.

- Teresa Auch Schultz, *Study: Northern Indiana corruption not so bad*, Post-Tribune, February 19, 2012.

- Christin Nance Lazerus, *Lack of incumbent makes for wide-open Lake county coroner race*, Post-Tribune, February 25, 2012.

Def. Br., Exh. A, pp. 41-43.

Of these articles, only the articles entitled "Philpot trial delays raise cooperation questions" on January 4, 2012, and "PHIL WEILAND: Get ready for some more Amazing predictions" on January 6, 2012, could be described as critical of Philpot rather than informative. The January 4,

8

2012 article is discussed above. The January 6, 2012 article makes eight tongue-in-cheek predictions for 2012, only one of which references Philpot: "I predict convicted former Illinois Gov. Rod Blagojevich will put his jail cell position up for sale to the highest bidder, saying, 'It's golden,' Lake County office hopper Tom Philpot will put in a bid." Def. Br., Exh. B-51. Philpot has not identified any articles written in March or April of 2012.

The Court's own internet research reveals that three articles were written in April and May 2012 about Philpot, and all three cover the filing and briefing of the instant Motion for Change of Venue filed by Philpot:

- Times Staff, *Defense requests change of venue for federal Philpot trial*, NWI Times.com, April 24, 2012.[1]

- Mark Kiesling, *Methinks Philpot doth protest too much*, NWI Times.com, April 27, 2012.[2]

- Sarah Tompkins, *Prosecutors say Philpot case should stay in Indiana courts*, NWI Times.com, May 14, 2012.[3]

The first and third articles are factual, while the second is critical of Philpot. As of June 6, 2012, the first article has no online comments, the second has nine, and the third has one. Of the nine comments to the second article, five are derogatory toward Philpot, three are favorable to Philpot, and two are neutral to Philpot personally. Most recently, an article was published in the Northwest

---

[1] http://www.nwitimes.com/news/local/lake/crown-point/defense-requests-change-of-venue-for-federal-philpot-trial/article_21a82293-5bce-5a46-bec5-0b1f2d0a6dce.html (last visited June 6, 2012).

[2] http://www.nwitimes.com/news/opinion/columnists/mark-kiesling/mark-kiesling-methinks-philpot-doth-protest-too-much/article_7d683c3e-a2ba-575c-bee8-2d74c04c15ea.html (last visited June 6, 2012).

[3] http://www.nwitimes.com/news/prosecutors-say-philpot-case-should-stay-in-indiana-courts/article_0792be69-6abd-5866-8095-d345a08c4e12.html (last visited June 6, 2012).

9

Indiana Times on June 5, 2012, entitled *Philpot hires additional attorney in upcoming federal fraud case*,[4] which is purely informational; two derogatory reader comments have been posted.

As in *Skilling,* courts look at the size of the area in which the pretrial publicity has occurred. Although Northwest Indiana is not as large as the metropolitan Chicago area, it nevertheless cannot be equated with a "small town" as opposed to a "metropolitan area," as suggested by Philpot. *See Willard v. Pearson*, 823 F.2d 1141, 1147 (7th Cir. 1987) (recognizing that a fair trial for the defendant may be more likely "in a metropolitan area like Indianapolis, where his case was just one story among many, than in a small town, where [the] case would likely be the biggest story in town."). The population of Lake and Porter Counties is approximately 660,000 residents. *See* www.stats.indiana.edu/population/popTotals/2011_cntyest.asp (last visited June 6, 2012). Although Philpot proposes the Northern District of Illinois as an alternate venue because the press coverage of this matter has been almost non-existent there, the news media coverage of Philpot's actions and the criminal indictment have not dominated the media in Northwest Indiana to necessitate a change of venue.

Philpot has not indicated how the pretrial publicity in this case has been any more severe than in other local political corruption cases successfully tried in this division of this court district in recent years or that a news media "circus" atmosphere occurred immediately before or during those trials. For decades, many prominent public officials have been tried as Defendants in this district where the judges have successfully picked juries and presided over fair trials in cases involving public officials charged with corruption, including city mayors, county and city councilmen, other high ranking county and city officials, judges, police officers, and the former

---

[4] http://www.nwitimes.com/news/local/lake/crown-point/philpot-hires-additional-attorney-in-upcoming-federal-fraud-case/article_5d61da55-9a06-5dc9-ad54-f5ca56c6166d.html (last visited June 6, 2012).

chairman of the Indiana Democratic Party. *See* Joe Carlson, *Fight against corruption continues,* NWI Times.com, September 30, 2007; Sentencing Order, *United States v. Pabey*, 2:10-CR-17-JTM, docket entry 97 (May 11, 2011).

Philpot argues that the overwhelming majority of negative publicity has resulted from Philpot's notoriety in the community as a longtime public official. It is hardly surprising or unusual that a federal indictment of an elected official, especially one with so many years of service, would draw the attention of the press or evoke comments from the public. But the coverage has not risen to a level such that Philpot cannot receive a fair trial. The jury pool is diverse in that jurors are drawn from both Porter and Lake Counties. In addition, it is premature for Philpot to assert actual bias, given that the jury has not yet been selected, or to assert what the nature of the news media coverage may be immediately before or during the jury trial.

Philpot suggests that the lack of control by the Court over the source of the news media coverage supports his request for transfer. He is correct that the source of the press coverage in this case is largely from news reporters, editorial writers, and ordinary citizens over whom the court has no control. *See Sheppard v. Maxwell*, 384 U.S. 333, 361 (1966). This is largely irrelevant in light of all the other factors discussed above. In addition, as the Court has noted, the news media coverage, which has been a mix of articles both critical of Philpot as well as simply informative of the proceedings of the case, has occurred over the span of almost two and a half years in various newspapers with intervals of months void of any reference to Philpot or his case.

Finally, Philpot argues that the press conference held by the United States Attorney on September 23, 2011, added to the "inflammatory" coverage of the indictment. The press conference was televised live and was reported on the nightly news and in the print media. At the press conference, United States Attorney David Capp reported the indictment and briefly stated, "A public

office is not a vehicle to get rich or to supplement your salary." Def. Br., p. 12 (quoting Sarah Tompkins, *VIDEO: Lake County Coronor, Sheriff's officers indicted*, September 23, 2011, http://www.nwitimes.com/news/local/lake/video-lake-county-coroner-sheriff-s-officers-indicted/vmix_79a4c8a6-1df7-5235-9f91-2c3ff94ba130.html (last visited June 5, 2012)). This statement by the United States Attorney is not shocking nor does it create a substantial likelihood of material prejudice to Philpot's right to a fair trial. Counsel for Philpot represents that he was compelled to respond to the United States Attorney's statement and to "calls for comment from the media." As a result, the news media reported on his statement: "Leonard Goodman, Philpot's attorney, said Philpot's decision to partake in the same federal incentive payments program as his employees came after he was told it was OK to do so – from an attorney paid for by the County Council . . . . Goodman said his client followed that advice." Def. Br., p. 13 (quoting Exh. B-41). Philpot argues that, as a result of his counsel's statement, the news media reacted negatively.

Like in *Skilling,* in which the volume of coverage far exceeded that in this case, and considering the totality of the circumstances, the pretrial publicity regarding the charges brought against Philpot does not merit a presumption of prejudice. *See Skilling*, 130 S. Ct. 2916; *Brecheen v. Oklahoma*, 485 U.S. 909, 910 (1988) ("In deciding whether such a presumption [of prejudice] is warranted, courts must examine 'any indications in the totality of circumstances that petitioner's trial was not fundamentally fair'"). Nor can the Court say in this case that the "trial atmosphere . . [will be] utterly corrupted by press coverage." *Skilling*, 130 S. Ct. at 2914. Rather, the best assurance that Philpot will receive a fair trial will be the Court's careful and extensive examination of the prospective jurors to ensure that an impartial jury is empaneled and the Court's continuing oversight. *See Nettles*, 476 F.3d at 513; *Peters*, 791 F.2d at 1296 (recognizing that it is "ordinarily preferable to assess the impact of the pretrial publicity through an extensive voir dire of the prospective jurors,

instead of in the vacuum of a hearing without reference to prospective jurors"); *United States v. Garza*, 664 F.2d 135, 139 (7th Cir. 1981); *Grancorvitz v. Franklin*, 890 F.2d 34, 40 (7th Cir. 1989).

As the Seventh Circuit has explained,

> an important case can be expected to arouse the interest of the public in the vicinity, and scarcely any of those best qualified to serve as jurors will not have formed some impression or opinion as to the merits of the case. This is particularly true in criminal cases. To hold that the mere existence of any preconceived notion as to the guilt or innocence of an accused, without more, is sufficient to rebut the presumption of a prospective juror's impartiality would be to establish an impossible standard. It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court.

*Peters*, 791 F.2d at 1298 (quoting *Irvin v. Dowd*, 366 U.S. 717, 722-23 (1961)).

## CONCLUSION

Based on the foregoing, the Court hereby **DENIES** Defendant's Motion for Change of Venue [DE 45].

SO ORDERED this 7th day of June, 2012.

s/ Paul R. Cherry<br>
MAGISTRATE JUDGE PAUL R. CHERRY<br>
UNITED STATES DISTRICT COURT

cc: All counsel of record